UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHIPYARD DEVELOPMENT, LLC,
SHIPYARD PARTNERS, LLC
BOAT WORKS LOFTS, LLC, and
THE VEGETABLE TRUCK, LLC

      Plaintiffs,

v.                                                                                               Case No. 09-C-216

CITY OF STURGEON BAY,

      Defendant.

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

      A group of developers (collectively "Shipyard"), upset with conditions imposed on them in carrying out their plan to develop property in downtown Sturgeon Bay ("the City"), and with delays caused by the City Administrator, filed this lawsuit under 42 U.S.C. § 1983, claiming that the City had violated Shipyard's substantive and procedural due process rights. State law claims for breach of contract and bad faith are also alleged in the complaint. An additional claim that the City's conduct amounted to an unconstitutional taking of property without just compensation in violation of both the United States and Wisconsin constitutions has apparently been abandoned. Federal jurisdiction exists under 28 U.S.C. §§ 1331, 1343, and 1367, and the case is presently before the court on the City's motion for summary judgment.

      The City's motion will be granted. Even viewing the evidence in the light most favorable to Shipyard and drawing all reasonable inferences in its favor, as the court must at this stage of the

proceedings, Shipyard's complaints do not amount to the violation of rights guaranteed by the United States Constitution. Accordingly, Shipyard's federal claims will be dismissed. With the federal claims gone, Shipyard's remaining state law claims will be dismissed without prejudice for lack of jurisdiction.

**I. BACKGROUND**

For many years the Peterson companies ("Peterson") operated a large shipbuilding facility in downtown Sturgeon Bay, Wisconsin. When Peterson ceased operations in 1996, the once-bustling shipyard turned into a quiet underused tract of waterfront property. In 2001, in order to encourage redevelopment of the Peterson property the City expanded a previously-existing downtown tax increment financing ("TIF") district to include the former shipyard property. TIF is a public financing method which is used to fund redevelopment projects. When a city creates a TIF district, the entire property tax revenue generated by new development within the district can be first used to pay the project costs, including financing costs, incurred by the city before other taxing authorities are allowed to share in it. *See* Wis. Stat. § 66.1105; *see also Sigma Tau Gamma Fraternity House Corp. v. City of Menomonie*, 93 Wis.2d 392, 401-04, 288 N.W.2d 85 (1980).

Peterson marketed its property to developers and, in early 2003, Shipyard expressed interest in developing the property and proposed a development project (the "Project"). Shipyard informed the City that the Project consisted of a series of planned unit developments ("PUD's"), which it wished to construct in the following sequence: (1) a condominium complex in Peterson's old Electric Building ("Boat Works Lofts 1"), with units to go on the market by the end of 2004; (2) a Marina consisting of a clubhouse and piers with boat slips, to open in 2005; (3) two four-unit

2

condominium buildings near the Marina and Electric Building ("Boat Works Lofts 2"), with units to go on the market by the end of 2005; and (4) a condominium complex along South 3rd Street ("Harborview"), with units to go on the market by the end of 2005.

Shipyard told the City that although it recognized its PUD applications and other Project-related activities would have to comply with applicable City ordinances, Shipyard did not want to purchase the Peterson property or proceed with the Project unless: (1) the City approved of Shipyard's development concept; (2) the City would cooperate in helping Shipyard obtain necessary permits from other agencies for Project facilities and would not interfere with the same; and (3) the City would act expeditiously in processing Shipyard's PUD applications and reaching a formal Development Agreement with Shipyard relating to TIF funding for the Project and related matters and would provide reasonable TIF funding. (Plaintiff's Proposed Findings of Fact, Dkt 53, "PPFF" 5.) Although no written agreement was entered into at that time, the City was in favor of the proposed development and agreed that it would cooperate with Shipyard in getting the necessary permits, negotiating an agreement and moving the project along. In May 2003, Peterson agreed in principle to sell the Property to Shipyard for development. On August 11, 2003 Shipyard signed an Option To Purchase with Peterson giving Shipyard the right to purchase the Property for $2.3 million. Closing did not occur until October 29, 2004, however.

On March 1, 2005, Shipyard entered into a written Development Agreement with the City. Under the terms of the Development Agreement, the City agreed to contribute $2,861,292 toward completion of the development project of which $200,000 was designated for park improvements. The rest of the funds contributed by the City were to be used for such items as building demolition, site preparation, geotechnical and environmental studies, dock wall repairs, retaining walls, road

3

construction, lighting and landscaping. (Doc. 40-1, at 15.) Some of this work was to be performed by the City, and some by Shipyard. The Development Agreement set out a procedure for Shipyard to obtain approval and reimbursement for costs assumed by the City. All other costs of the private improvements that comprised the Project were to be borne by Shipyard. In addition, the plans and specifications for each PUD required City approval.

The Project did not go as smoothly as Shipyard hoped and planned. A number of disputes arose between Shipyard and the City, several of which Shipyard has attempted to cast as constitutional violations. The first concerned two parcels of the Property that the City agreed to purchase separately from Peterson for use as a public park. In early 2003, prior to Shipyard's purchase of the Property, the City had discussed with Peterson the City's interest in purchasing certain parcels of the property for use as a park. The City had applied for a grant from the Wisconsin Coastal Management Council ("WCMC") to purchase the park parcels at an estimated total project cost of $500,000. WCMC's contribution was to be 75% of the value of the property, as determined by an appraisal. On April 4, 2003, the parcels were appraised at a value of $435,000. Both Peterson and Shipyard thought the appraisal was too low. Shipyard claims that park parcels had a value closer to $700,000. The difference mattered to Shipyard because the $2.3 million purchase price it had agreed to pay Peterson for the Property was to be reduced by the amount Peterson received for the park parcels. In addition to the price of the park parcels, Shipyard also disputed the boundaries. Shipyard claims that Krauss told it that if Shipyard disputed either the $435,000 purchase price or the boundaries for the park parcels, Shipyard's PUDs would not be approved and it would receive no TIF funding. Faced with such a threat, Shipyard claims it agreed to the reduced purchase price and compromised with the City over the boundary dispute. Shipyard

4

contends that the City's threat to refuse to approve its PUDs and deny it TIF funding if Shipyard did not drop its objections to the purchase price and boundaries for the park parcels constitutes a violation of its right to substantive due process.

A dispute also arose in connection with a part of the Project that dealt with what had been the Peterson Electric Shop and Shipyard's plan to construct a wall separating it from the City's new park. Shipyard intended to save the Electric Shop and convert it into six high-end condominium units overlooking both the park and the waters of Sturgeon Bay. This portion of the development was referred to as "Boat Works Lofts 1." The Electric Shop building encroached on the City's Pennsylvania Street right of way, but because the building was over 100 years old, it was a "grandfathered" legal nonconforming use under City Ordinance § 20.26. In the Spring of 2005, prior to renovating the Electric Shop, Shipyard discussed the encroachment with Krauss. (PPFF 76.) After Krauss indicated that he did not see any problem with the encroachment, Shipyard moved forward and renovated the Electric Shop building. In order to assure condominium purchasers that the encroachment would not be a problem, Shipyard asked the City in late summer or early fall of 2005 to grant it a license for the Electric Shop's encroachment on the Pennsylvania Street right of way. (PPFF 89.) By that time, however, the City had become concerned over public access to the new City park along Pennsylvania Street.

Public access from Pennsylvania Street became a problem as a result of changes in the design of the wall that Shipyard intended to construct adjacent to the Electric Shop. At the City's request, Shipyard agreed to construct a stepped or terraced wall, as opposed to the vertical wall it originally planned to build. The stepped wall encroached further onto the City's right-of-way, however, and would have prevented construction of the sidewalk that the City planned for

5

pedestrians and bicyclists to use to access the new park from Pennsylvania Street. Despite the fact that the City had already approved the design, Krauss ordered a stop to construction of the wall and insisted that Shipyard grant the City an easement along a portion of Oregon Street leading to the new park. According to Shipyard, Krauss also made granting the City an easement along Oregon Street a condition of the City's granting Shipyard a license for the Electric Shop's encroachment onto the Pennsylvania Street right-of-way. Krauss told Shipyard that the City would object to the license unless Shipyard granted the City an easement to the Park along a portion of Oregon Street. (PPFF 90-92.) Ultimately, Shipyard agreed to convey to the City the easement it requested as part of a land swap that also included a parking lot the City owned. Here, too, however, Shipyard contends that the City's conduct amounts to a denial of substantive due process. Shipyard contends that the City's decision to impose such a condition on it without prior notice and an opportunity to be heard also constitutes a violation of its right to procedural due process.

Next, Shipyard contends that the City delayed the Project by ordering a new hearing for approval of the PUD application for development of the two 4-family condominium units planned as part of the Boat Works Loft 2 phase of the Project after it had already been approved. Under City ordinances, PUD applications required preliminary and final approval from the City Plan Commission and the City Council. The Commission is required to hold a public hearing before giving final approval, and notice of the hearing must be given to all property owners whose property lies within 300 feet of the exterior boundary of the property that is the subject of the proposed zoning amendment. (PPFF 93.) The Commission held a public hearing on the Boat Works Lofts 2 phase of the Project on May 18, 2005, and approved the preliminary PUD without objection. (PPFF 96.) Krauss insisted that a second hearing be held because notice had been sent only to those

6

who owned property within 300 feet of the condominium units, as opposed to those with property within 300 feet of the entire project. Shipyards contends that notice to the additional property owners was clearly unnecessary and that Krauss needlessly delayed the project by insisting on a second hearing. This phase of the Project was again delayed after Krauss insisted on another hearing to approve what Shipyard contends were minor changes in the design of the garages for each of the units. Shipyard contends that it did not learn of the order for a new notices and public hearings until after Krauss had made the decisions and that it was therefore denied its right to procedural due process.

Finally, Shipyard contends its right to procedural due process was violated by the manner the City dealt with it in connection with the sale of a parking lot. Under the March 1, 2005 Development Agreement between the City and Shipyard, the City promised to sell a parcel of land at the corner of Third and Quincy Streets ("the Parking Lot Parcel"). The Agreement provided that both the City and Shipyard were to obtain appraisals for the Parking Lot Parcel, and if the appraisal values differed by more than 15%, the sales price would be determined by averaging both of the appraisals along with a third independent appraisal. (PPFF 106-107.) In August 2005 Shipyard's appraiser appraised the parcel at $26,000, and Shipyard promptly provided its report to the City. Undisclosed to Shipyard, the City's assessor estimated the value of the Parking Lot Parcel at $25,000. The City retained its own appraiser who failed to comply with basic standards of reasonableness and placed the value at $75,000. Krauss did not share the City's appraisal with Shipyard, however, despite several requests from Shipyard. The City finally turned over the appraisal in February 2006 after Shipyard brought the issue to the City Council's attention. (PPFF 107, 113.) Because the difference between the two appraisals exceeded 15%, a third appraiser was

7

selected who appraised the Parking Lot Parcel at $38,000. (PPFF 122.) After the third appraisal was completed, Shipyard chose not to proceed with the purchase of the Parking Lot Parcel as laid out in the Development Agreement. Shipyard eventually received the Parking Lot Parcel in July 2007 as part of a land swap agreement between the City and Shipyard. (DPFF 39.) Shipyard argues, however, that the City violated its right to procedural due process by obtaining an appraisal it knew was flawed, repeatedly refusing to provide Shipyard a copy of its appraisal, and making baseless accusations that Shipyard's appraisal was flawed.

Shipyard claims that this same conduct and other actions taken by the City over the course of the Project also support its state law breach of contract claims. The other actions include Krauss' unfavorable testimony at a hearing on Shipyard's application for a permit from the Wisconsin Department of Natural Resources to construct a marina, and the City's delay and withholding of TIF payments. Because Shipyard's constitutional claims fail as a matter of law, however, and because the court declines to exercise jurisdiction over the remaining state law claims, it is not necessary to provide further detail concerning them.

## II. ANALYSIS

### A. Constitutional Claims

42 U.S.C. § 1983 is the statutory vehicle for bringing actions in federal court for constitutional violations. It provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...

8

In order to maintain a claim under § 1983, Shipyard must show that the City deprived it of a right secured by the Constitution and laws of the United States, and that the City acted under the color of state law. *Brown v. City of Lake Geneva,* 919 F.2d 1299 (7th Cir. 1990). Shipyard claims that the City deprived it of its Fourteenth Amendment right to substantive due process by improperly conditioning TIF funding and/or City approval of certain phases of the Project upon Shipyard's withdrawing its objections to the price and boundary lines of the park parcels the City purchased from Peterson and Shipyard's agreement to convey an easement over its land to the City. Shipyard claims the City violated its right to procedural due process by failing to provide advance notice and an opportunity to be heard before it decided to require the easement and conduct further hearings on the Boatworks Loft 2 phase of the Project, and by delaying its purchase of the Parking Lot Parcel. None of these claims has merit.

The Seventh Circuit has held that the special ripeness doctrine for constitutional property rights claims announced by the Supreme Court in *Williamson County Reg. Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 193-94 (1985), applies to substantive and procedural due process claims brought by property developers against state or local officials over limitations on the use of their land. *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 167 (7th Cir.1994) ("[A] property owner may not avoid *Williamson* by applying the label 'substantive due process' to the claim. So too with the label 'procedural due process.' Labels do not matter. A person contending that state or local regulation of the use of land has gone overboard must repair to state court."). Under this doctrine, federal courts are precluded from adjudicating land use disputes until: "(1) the regulatory agency has had an opportunity to make a considered definitive decision, and (2) the property owner exhausts available state remedies for compensation." *Forseth v. Village of Sussex*,

199 F.3d 363, 368 (7th Cir. 2000). Where the landowner elects to forego the state remedies, his federal claims will be dismissed. *See River Park*, 23 F.3d at 165 ("Litigants who neglect or disdain their state remedies are out of court, period.").

Even aside from *Williamson*'s ripeness doctrine, Shipyard's substantive due process claims are of doubtful merit. For example, although Shipyard claims that the City coerced it into dropping its objections to the City's purchase price and proposed boundary for the park parcels, it is undisputed that the City purchased the park parcels from Peterson, not Shipyard, and that it agreed with Peterson on the price the City would pay before Shipyard even signed the option to purchase the Property. (Aff. of Martin Olejniczak, Ex. 32-33.) If Shipyard didn't like the price the City agreed to pay Peterson, it could have declined to purchase the Property and walked away from the Project, or negotiated a different price for the remainder of the Property with Peterson. Shipyard's boundary dispute with the City was resolved by a compromise, as were also the disputes over the Oregon Street easement and the Parking Lot Parcel. If Shipyard was unhappy with the compromises, it should not have entered into them. This is hardly the stuff of substantive due process claims. *See Palka v. Shelton*, 623 F.3d 447, 453-54 (7th Cir. 2010) (noting that official misconduct will rise to the level of a substantive due process violation "only if it shocks the conscience") (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)).

Shipyard's procedural due process claims are even more dubious. "To state a Fourteenth Amendment claim for the deprivation of a property interest without due process, a plaintiff must demonstrate that (1) he had a constitutionally protected property interest, (2) he suffered a loss of that interest amounting to a deprivation, and (3) the deprivation occurred without due process of law." *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 943-44 (7th Cir. 2010) (citing

*Moss v. Martin*, 473 F.3d 694 (7th Cir. 2007)). It is unclear what property interests Shipyard claims were taken away. Shipyard states in its brief that "Shipyard has made procedural due process claims based on (a) BWL [Boat Works Loft] 1 Building and Wall, (b) the delays in approving the BWL 2 Condo PUD and (c) the delays in conveying the Parking Lot Parcel." (Br. in Opp. at 32.) Shipyard apparently believes that it was entitled under its contract with the City to prompt approval of its project plans and a prompt (or at least more prompt) determination of the price it would be required to pay for the Parking Lot Parcel. But even if this is true, it still falls short of establishing the existence of a constitutionally protected property interest.

Shipyard cites *Peninsula Properties, Inc. v. City of Sturgeon Bay*, No. 04-C-692, 2005 WL 2234000 at *6 (E.D. Wis. Aug. 17, 2005), as support for its argument that "a municipality's repeated refusal to respond to requests for action to which the requestor is entitled may be a violation of procedural due process even if the municipality ultimately takes action." (Opp. Br. at 28.) This principle is not what *Peninsula Properties* holds, however. Shipyard's read certainly can't be correct as it is so broad that it would constitutionalize every adverse zoning decision. Moreover, it is clear from its complaint that Shipyard is not seeking notice and a hearing on its right to a prompt determination. Shipyard wants money for the losses it claims to have sustained as a result of the delay. Shipyard's claims are not for a denial of procedural protections. *See Taake v. County of Monroe*, 530 F.3d 538, 543 (7th Cir. 2008) ("Taake used the words "procedural due process" in his complaint, but the remedies he seeks belie any suggestion that Taake is interested in notice and a hearing on the County's decision not to sell him the land. The only remedies Taake desires are for the alleged breach of contract: damages, specific performance of the land sale, and an injunction

11

prohibiting the County from transferring or disposing of the land in a manner that violates the purported contract.").

Notwithstanding, or in addition to, these difficulties, however, Shipyard's constitutional claims must be dismissed because Shipyard has adequate state law remedies to resolve their claims against the City. Indeed, perhaps the strongest indication that Shipyard has available state law remedies is the fact that it has asserted them in the same action in which it asserts its constitutional claims. Shipyard has sued the City for breach of contract based on essentially the same factual allegations on which its due process claims rest. (Br. in Opp. at 34.) *See Forseth*, 199 F.3d at 373 ("Indeed, they implicitly acknowledge their failure to pursue available state remedies at that juncture by filing a substantially similar complaint in Wisconsin state court alleging claims under Wisconsin law following the district court's dismissal of this case."). Shipyard's contractual remedies and the other statutory remedies Wisconsin provides to those who seek judicial review of, or to compel, municipal action, i.e., certiorari, mandamus, are or were available to provide Shipyard whatever relief to which it may have been entitled. Shipyard's decision to compromise with the City so that the project could move forward does not change the result. *See Covington Court, Ltd. v. Village of Oak Brook*, 77 F.3d 177, 179 (7th Cir. 1996) ("Instead, Covington chose to negotiate with Bailes, and the two parties reached an agreement that enabled the Whitehall Park project to go forward. Covington's instant lawsuit is an attempt to circumvent that decision.").

The Seventh Circuit has repeatedly "reminded litigants that federal courts are not boards of zoning appeals." *Covington Court*, 77 F.3d at 179 (citing *River Park*, 23 F.3d at 165). That warning should have been heeded here. Shipyard's disputes with the City over the Project do not

12

amount to the violation of Shipyard's constitutional rights. Accordingly, the City's motion for summary judgment on Shipyard's § 1983 claims will be granted.

### B. State Law Claims

Having disposed of Shipyard's federal claims, the court must now decide whether to retain jurisdiction over its state law claims against the City. "[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). But this is not always so. "There are . . . unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness and comity-will point to federal decision of the state-law claims on the merits." *Id.* The case law has established three exceptions to the general rule that supplemental federal jurisdiction over state law claims should be relinquished when the federal claims are dismissed: "when the refiling of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim is to be decided." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) (citing *Wright*, 29 F.3d at 1251-52).

Shipyard argues that the court should retain jurisdiction over its state law claims even if the federal claims are dismissed because substantial resources have already been expended in the case. To send the case to state court at this point, Shipyard argues, would cause a substantial duplication of those efforts. The City, on the other, hand, notes that "relinquishing federal jurisdiction is the

13

norm rather than the exception." (Br. In Supp. at 30) (citing *Contreras v. Suncast*, 237 F.3d 756, 766 (7th Cir. 2001)).

The court declines to retain jurisdiction. Although the parties have completed discovery and fully briefed the issue, this is usually the case when the general rule comes into play. Federal claims, if dismissed before trial, are typically dismissed after discovery has been completed and motions for summary judgment have been decided. Presenting the issue in a state forum should not require duplicating counsel's work; it simply shifts it to another forum. More importantly, retaining jurisdiction would require the court to resolve novel or at least complex issues of state law. This is precisely what the general rule requiring district courts to relinquish jurisdiction under such circumstances is intended to avoid: "the general rule that we have cited is designed to minimize the occasions for federal judges to opine on matters of state law." *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997). Under these circumstances, comity, that is, "respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns." *Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir. 1989).

Retention of federal jurisdiction over Shipyard's state claims would require the Court to determine the requirements of section 893.80, Wisconsin's notice of claim statute, and whether Shipyard complied sufficiently to allow its claims to go forward. The court would also have to determine whether under Wisconsin law the "preliminary agreement" that Shipyard alleges the parties entered into in 2003 created any contractual rights or obligations of the parties. Shipyard's claim that the City breached its duty of good faith would require the court to wade into an area of Wisconsin law that is less than clear. Even the claims based on the Development Agreement between the parties would require this court to construe the Agreement's various provisions in light

14

of the municipal ordinance and zoning provisions to which it refers. All this in the kind of case that the Seventh Circuit has repeatedly emphasized has no business in federal court. Under these circumstances, the court concludes that the prudent course is to decline to exercise federal jurisdiction over the remaining state law claims.

## III. CONCLUSION

For the above stated reasons the City's motion for summary judgment is **GRANTED**. Shipyard's federal claims are dismissed without prejudice because they are not ripe. Shipyard's state law claims are also dismissed without prejudice because the court declines to exercise supplemental jurisdiction over them.

Dated this   24th   day of February, 2011.

                                                                        s/ William C. Griesbach
                                                                         William C. Griesbach
                                                                         United States District Judge